CRAIG LABADIE
CITY ATTORNEY
CITY OF ALBANY

RICHARDS, WATSON & GERSHON
  A Professional Corporation
GREGORY W. STEPANICICH (Bar No. 78317)
gstepanicich@rwglaw.com
T. PETER PIERCE (Bar No. 160408)
ppierce@rwglaw.com
TOUSSAINT S. BAILEY (Bar No. 245641)
tbailey@rwglaw.com
44 Montgomery Street, Suite 3800
San Francisco, California 94104-4811
Telephone:  415.421.8484
Facsimile:  415.421.8486

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE CODY; PATRICIA MOORE; ROBERT WHARTON; APRIL ANTHONY; LARRY CABRERA; JOSEPH ROSE; STEPHANIE RINGSTAD; ALEXANDER RICHARD WILSON; TAMARA ROBINSON; PHILIP WILLIAM LEWIS; and ALBANY HOUSING ADVOCATES, a California non-profit public benefit corporation,<br><br>             Plaintiffs,<br>      v.<br><br>CITY OF ALBANY; ALBANY POLICE DEPARTMENT; and MIKE MCQUISTON, in his official capacity as Chief of Police,<br><br>             Defendants. | Case No. C 13-05270 CRB<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:         November 18, 2013<br>Time:         2:00 P.M.<br>Courtroom:  6 (17th Floor)<br><br>Action Filed: November 13, 2013<br><br>Judge:        Honorable Charles R. Breyer |

## **TABLE OF CONTENTS**

**Page**

I. BACKGROUND ...................................................................................................1

II. CITY'S BULB TRANSITION PLAN WAS TAILORED TO ADDRESS CONCERNS LIKE THOSE PLAINTIFFS INITIALLY RAISED ..................................................................................................3

    A. The City's Bulb Transition Plan Does Not Criminalize The Status Of Homeless Persons ...........................................................3

    B. The City Will Not Seize Or Destroy Personal Property Found At Bulb Encampments Without Ample Notice To Potential Owners ...........................................................................4

    C. Structures At The Bulb Will Be Afforded The Same Due Process Under The City's Building Code As Structures Throughout The City ...............................................................5

III. THE IRREPARABLE HARMS AND HARDSHIPS ALLEGED IN PLAINTIFFS' MOVING PAPERS FLOW FROM SUPPOSITION AND MISINFORMATION; NOT FROM THE CITY'S TRANSITION PLAN ..............................................................6

IV. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ...............................................................................................................6

    A. Plaintiffs Fail To Show A Likelihood Of Success On Their Eighth Amendment Claim ............................................................6

    B. Plaintiffs Fail To Show A Likelihood Of Success On Their Americans With Disabilities Act Claim ...................................9

    C. Plaintiffs Fail To Show A Likelihood Of Success On Their Substantive Due Process Claim ..............................................11

        1. The City Does Not Create Danger By Offering Temporary Housing To Plaintiffs ................................................12

        2. The City Has Not Acted With Deliberate Indifference To A Known Danger ..........................................12

    D. Plaintiffs Fail To Show A Likelihood Of Success On Their Procedural Due Process Claim ..............................................13

    E. Plaintiffs Fail To Show A Likelihood Of Success On Their Right To Privacy Claim ............................................................14

V. CONCLUSION ..................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bryan County v. Brown*,
520 U.S. 397 (1997) ........................................................................................................ 13

*CALHO v. City of Santa Monica*,
88 Cal. App. 4th 451 (2001) ........................................................................................... 16

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992) ........................................................................................................ 11

*Corales v. Bennett*,
567 F.3d 554 (9th Cir. 2009) ........................................................................................... 11

*De-Occupy Honolulu v. City and County of Honolulu*,
2013 U.S. Dist. Lexis 71968, *16-17 (D. Haw. 2013) .................................................... 14

*Giebeler v. M&B Associates*,
343 F.3d 1143 (9th Cir. 2003) ......................................................................................... 10

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) .......................................................................................................... 16

*Ingraham v. Wright*,
430 U.S. 651 (1977) ........................................................................................................ 11

*Jones v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006) ........................................................................................... 7

*Kennedy v. City of Ridgefield*,
439 F.3d 1055 (9th Cir. 2006) ................................................................................... 11, 12

*Lindsey v. Normet*,
405 U.S. 56 (1972) .......................................................................................................... 16

*McGary v. City of Portland*,
386 F.3d 1259 n.3 (9th Cir. 2004) ............................................................................... 9, 10

*Oconomowoc Residential Programs, Inc. v. City of Milwaukee*,
300 F.3d 775 (7th Cir. 2002) ............................................................................................. 9

*Parrish v. Civil Service Com.*,
66 Cal.2d at 270 .............................................................................................................. 15

*People v. Katrinak*,
136 Cal.App.3d 145 (1982) ............................................................................................. 15

*Robbins v. Superior Court*,
38 Cal.3d 199 (1985) ...................................................................................................... 14

<sup></sup>
<sup></sup>

# **TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Thornton v. City of St. Helens*,
425 F.3d 1158 (9th Cir. 2005) ............................................................................... 13

*Tobe v. City of Santa Ana*,
9 Cal.4th 1069 (1995) ............................................................................... 7, 8, 16

*United States v. City of Chicago Heights*,
161 F.Supp.2d 819 (N.D.Ill. 2001) ............................................................................... 10

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7, 129 S.Ct. 365 (2008) ............................................................................... 6

*Zimmerman v. Bishop Estate*,
25 F.3d 784 (9th Cir. 1993) ............................................................................... 16

**Statutes**

Title 28 Code of Federal Regulations, Section 35.130(b)(7) ................................... 9

Title 42, United States Code, Section 12132 ............................................................. 9

Title 42, United States Code, Section 3604(f)(3(B) ................................................... 9

## I. BACKGROUND

The declaration of City of Albany Police Chief Mike McQuiston, filed concurrently with this brief, provides background on the Albany Bulb/Waterfront Park (the Bulb). Notably, the declaration explains the City's numerous health and safety concerns with respect to persons living at the Bulb.

Other regulating agencies also have raised health and safety concerns with respect the Bulb encampments. The Alameda County Department of Environmental Health, as the local enforcement agency for solid waste, routinely inspects active and closed landfills for conformance with the California Public Resources Code and California Code of Regulations. In 2010, the Department issued a letter to the City outlining four concerns with respect to the Bulb: (1) "Homeless encampments were observed in several areas of the closed landfill"; (2) "Garbage is being generated by the homeless"; (3) Evidence of burning and/or having campfires observed"; (4) Issue of how area around the homeless encampments is being maintained, where trash and human wastes are being disposed of, etc." (Bond Decl. ¶ 2, Exh. A.) After explaining its concerns, the Department concluded: "At this time, this Agency is informing your City, as the responsible owner of the subject property, of the potential for health and fire hazards as are evident by these observations and findings. As the owner, it is highly recommended that your City correct these areas of concern before any untoward emergencies occur." (*Id.*)

In March 2013, the San Francisco Bay Region of the California Regional Water Quality Control ("Water Board") Board expressed similar concerns and underscored its opposition to the Bulb encampments. The Water Board staff stated:

> "With respect to the homeless encampments and landfill 'mining,' Water Board staff are concerned about both activities, which pose a threat to human health and environmental quality. We do not support the current use of the Bulb as an encampment and we will not support any legalization of the situation. The unsanitary conditions associated with unmanaged human wastes pose health and water quality concerns, and the mining has created some obvious safety hazards. These issues are the responsibility of the property owners, the City of Albany and East Bay Regional Park District (the Park District), who have attempted to address the issue. Unfortunately, those efforts were

> met with strong, vocal resistance by groups and individuals advocating for preserving the current 'wildness' of the site, as well as for the rights of the homeless to reside on the property. Recently, the Park District erected signs warning of the hazardous conditions at the site and along the shoreline; unfortunately, these signs were promptly covered with graffiti or removed.
>
> Given this unfortunate situation, Water Board staff will attempt to uphold our mission of protecting water quality at the site to the best of our ability; however, we must defer to the City of Albany and the Parks District for direct supervision of the site and protection of public safety."

(Bond Decl. ¶ 3, Exh. B.)

In May 2013, the City's Homeless Task Force presented a report to the City Council, which included a number of policy options for addressing the homelessness at the Bulb and elsewhere. (City's RJN Exh. A, May 6, 2013 staff report, at attachment 2].) After considering the options, along with pros and cons for each option, the City Council unanimously supported the option that contemplated enforcement of the City's no camping ordinance in conjunction with hiring an outreach and engagement team to provide services and housing for homeless individuals in the City. (*Id.* at attachment 2, Option 1B; Plaintiff's RJN, Exhs. 5.) The City Council directed staff to begin enforcing the no camping ordinance in October of 2013. (Plaintiff's RJN, Exhs. 5.) The City Council also directed the Mayor and City Manager to meet with East Bay Regional Park District and State Parks to being a process to transfer the Bulb to the McLaughlin Eastshore State Park. (*Id.*)

On September 3, 2013, after receiving further public input, the City Council reaffirmed its adopted policy for addressing homelessness in the City. Plaintiffs' counsel wrote a letter to the City requesting that the City "agree to postpone enforcement of [its no-camping] ordinance until such a time that there is a well-developed plan to transition the residents of the Bulb to suitable housing." (City's RJN, Exh. B [Sept. 24 letter from plaintiffs].) Plaintiffs expressed fear that the no camping ordinance would be enforced at the Bulb without alternative "shelter beds," "transitional housing," or "supported living arrangements" for homeless individuals

who desired such arrangements and without a plan for personal belongings found at the Bulb. (*Id.* at pp. 2-3.) The City has, in fact, delayed enforcement well beyond October 1, 2013.

Moreover, it is undisputed that the City has fashioned a well-developed transition plan (albeit not the plan of Plaintiffs' choosing). In mid-October, Plaintiffs' counsel remarked, in a letter to the City regarding the Bulb transition plan: "We appreciate that the City appears to be putting considerable thought into how to transition the current Bulb residents off the Bulb, and how to provide them support in finding housing that meets their needs. We also appreciate that the City is willing to commit significant funds to the project." As explained below, the City's transition plan considers and protects the rights of people at the Bulb and their property.

## II. CITY'S BULB TRANSITION PLAN WAS TAILORED TO ADDRESS CONCERNS LIKE THOSE PLAINTIFFS INITIALLY RAISED

### A. The City's Bulb Transition Plan Does Not Criminalize The Status Of Homeless Persons

The City's transition plan does not criminalize individuals. The City's transition plan calls for a mobile transition center. (City's RJN, Exh. C [10/21 staff report] at p. 3; Plaintiffs' RJN, Exh. 17.) The transition center will provide assistance to homeless individuals transitioning from the Bulb. (*Id.*) The City has contracted with local nonprofit service providers to help connect people with human and health services, food, clothing, housing and other transitional support to meet their needs. Operation Dignity will manage the transition center while Berkeley Food and Housing Project (BFPH) continues to provide support services and housing placement. (*Id.*)

The City's plan provides for transitional shelter on City owned property at the waterfront near the Bulb. (City's RJN, Exh. C [10/21 staff report] at p. 3; Plaintiffs' RJN, Exh. 17.) Importantly, "[t]he temporary shelter is intended to ensure those relocating from the Bulb have an alternative sheltered location. Despite Plaintiffs'

unsupported assertions to the contrary (Plaintiffs' Motion, p. 4), the City does not intend to cite or arrest individuals who have no alternative to camping at the Bulb.

In addition to the temporary shelter being provided by the City, City staff will continue its efforts to identify alternative shelter in nearby locations. (City's RJN, Exh. C [10/21 staff report] at p. 3; Plaintiffs' RJN, Exh. 17.) The City is also working with BFHP to identify locations for a limited number of rental units to support homeless individuals that may have income from employment or public assistance to contribute to a monthly rental. (*Id.*) It is anticipated that the City would subsidize 40% of the rental unit, and a grant would subsidize another 30% of the rental. (*Id.*)

### B. The City Will Not Seize Or Destroy Personal Property Found At Bulb Encampments Without Ample Notice To Potential Owners

The evidentiary record does not support Plaintiffs' assertion that the City's transition plan will result in summary seizure or destruction of the personal belongings of individuals camping at the Bulb (Plaintiffs' Motion, pp. 9-10). In September 2013, the City adopted a comprehensive set of administrative procedures for removal of temporary shelters, personal property, and refuse on public property. (Plaintiffs' RJN, Exh. 18.)

Approximately fourteen days prior to undertaking a clean-up, the City makes reasonable efforts to provide informal notice to inhabitants of encampments such as the Bulb through face-to-face communications and distribution of informational flyers. (Plaintiffs' RJN, Exh. 18, p. 3.) Then, at least seven days prior to undertaking a clean-up, the City will seek to provide written notice of the intended clean-up by posting or distributing written notice reasonably calculated to provide effective notice to any inhabitants of adjacent temporary shelters or campsites. (*Id.*) The City will photograph the area where clean-up is to occur to document site conditions before and after the clean-up. (*Id.*)

The City will take reasonable precautions to prevent disposal or destruction of

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EX PARTE MOTION AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
10000-0274\1663308v1.doc

any items which appear to be the personal property of any individual. (Plaintiffs' RJN, Exh. 18, p. 4.) The City will not assume that property which is temporarily unattended has been discarded or abandoned. (*Id.*) Reasonable doubt about whether an item constitutes trash or debris, as opposed to personal property, is resolved in favor of treating the item as personal property. (*Id.*) The City's administrative procedures also include Guidelines for Property Identification. (*Id.*)

Personal property that is collected will be recorded using a standard Property Receipt and Release Form. After the removal of all personal property, the City will post written notice of property retrieval. (*Id.*) Personal property will be stored at no charge to the owner for at least 120 days, during which time the property will be available to be reclaimed by the owner. Only after the expiration of 120 days, may property be donated, sold or discarded by the City. (*Id.*)

### C. **Structures At The Bulb Will Be Afforded The Same Due Process Under The City's Building Code As Structures Throughout The City**

Structures at the Bulb will be afforded the same process as similar structures elsewhere in the City. The City Building Official will inspect buildings and structures illegally erected on public property and follow the City's process for abating these conditions. (Plaintiffs' RJN, Exh. 18, p. 4.) The Albany Municipal Code, Chapter 12-5, sets forth the main process to abate unsafe structures. (City's RJN, Exh. D.) If an inspection shows a structure to be unsafe, the building official must post a "notice to repair" on the property and send the notice to all owners of record shown on the title report. (*Id.* at § 12-5.2(a).) The building official must also send a "notice to vacate" to each unit if the structure is unfit for human occupancy. (*Id.* at § 12-5.2 (b).) If the deficiencies are not corrected, a noticed hearing before the City Council is held to show cause why the structure should not be declared a public nuisance, the nuisance be abated, and the costs be charged to the owner(s). (*Id.* at §§ 12-5.3, 12-5.4.) If the owner does not commence abatement within 15 days

of the Council's order to abate, the building official may demolish or repair the building. (*Id.* at § 12-5.5(a).) The owner may dispute the itemized "statement of expenses" in a noticed hearing, and has five days to submit payment until the expenses constitute a lien on the property. (*Id.* at §§ 12-5.5(b), (c), 12-5.6(a), (b).)

## III. THE IRREPARABLE HARMS AND HARDSHIPS ALLEGED IN PLAINTIFFS' MOVING PAPERS FLOW FROM SUPPOSITION AND MISINFORMATION; NOT FROM THE CITY'S TRANSITION PLAN

Plaintiffs' balancing of hardships and analysis of irreparable harm are fatally defective because, as demonstrated above, each discussion is based on inaccurate speculation regarding the City's Bulb transition plan and an inaccurate portrayal of the conditions at the Bulb.

Plaintiffs must demonstrate that irreparable injury is likely in the absence of a temporary restraining order. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 375 (2008). An injunction may not be granted based on a mere "possibility" of irreparable harm, even if plaintiffs demonstrate a strong likelihood of success on the merits (which plaintiffs here have not). *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 375.

As explained above, plaintiffs' moving papers ignore significant health and safety risks at the Bulb documented by the City and others. Furthermore, Plaintiffs speculation regarding implementation of the City's transition plan is not consistent with the factual record: the City will not cite or arrest Bulb campers who lack alternative shelter; property will not be seized without notice; and Bulb encampments will not be summarily destroyed.

## IV. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A. Plaintiffs Fail To Show A Likelihood Of Success On Their Eighth Amendment Claim.

The Eighth Amendment prohibits a city from punishing a homeless person when that person has no other option but to live on public property. In *Jones v. City*

*of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), vacated by settlement, 505 F.3d 1006 (9th Cir. 2007) (*Jones*), the court held "only that . . . the Eighth Amendment prohibits [a city] from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an *unavoidable consequence of being human and homeless without shelter* in [that city]." *Id.* at p. 1138 (italics added). "We do not hold that the Eighth Amendment . . . prevents the state from criminalizing conduct that is not an unavoidable consequence of being homeless . . . ." *Id.* at p. 1137.

Plaintiffs have not shown on the undeveloped record that the City would be punishing them for conduct that is an unavoidable consequence of being homeless. As explained above, the Bulb transition plan offers specific alternatives, including making available temporary shelter to transition the homeless people at the Bulb to more permanent living arrangements and assisting individuals in identifying more permanent housing. The City will also offer a host of support services for homeless individuals. If the temporary shelters become fully occupied, and persons at the Bulb are not able to gain access to other shelters, the City will not issue citations to them. Only those persons living at the Bulb who refuse to accept available shelter are eligible to be cited for violating the City's anti-camping ordinance. *Jones* expressly stated that "we are not called upon to decide the constitutionality of punishment when there are beds available for the homeless in shelters." *Jones*, 444 F.3d at 1138. Thus, under the actual circumstances here, and not the imagined scenario conjured by plaintiffs, plaintiffs cannot show that the City of Albany, by issuing citations, would be punishing persons for conduct that is an unavoidable consequence of being homeless.

The facts here instead are more appropriately analyzed under *Tobe v. City of Santa Ana*, 9 Cal.4th 1069 (1995) ("*Tobe*"). There, the California Supreme Court considered the constitutionality of "anti-camping" ordinances which were challenged by various homeless persons and taxpayers. The California Supreme Court held that an ordinance that bans camping and storing personal possessions on public property

did not constitute "cruel and unusual punishment" because the ordinance proscribed specific acts, not the status of being homeless. *Id*. at 1104; see also *Robinson v. California*, 270 U.S. 660 (1962). Notably, "[t]he ordinance permits punishment for proscribed conduct, not punishment for status." *Id*. at 1104. As in *Tobe*, the City's Bulb transition plan does not criminalize homelessness, but rather proscribes specific curfew violations and camping acts. Also, as noted above, only those persons living at the Bulb who refuse to accept available shelter are eligible to be cited for violating the City's anti-camping ordinance. Thus, the Bulb transition plan does not criminalize the homeless people at the Bulb based on their homeless status, and, accordingly does not violate the Eighth Amendment. Plaintiffs attempt to distinguish *Tobe* on the ground that it did not involve people involuntarily camping on public property. (See Plaintiffs' Motion, p. 14, n. 9.) However, *Tobe* is precisely on point here where the City is enforcing anti-camping ordinances against specific proscribed acts occurring on the Bulb, and not based on an unavoidable consequence of being homeless, as explained above.

Plaintiffs contend that the City's Bulb Transition Plan "criminalizes the status of homelessness" in violation of the Eighth Amendment because some of the Bulb homeless people will have no shelter in six months after implementation of the Bulb Transition Plan, and other homeless people will allegedly face an immediate situation where it is impossible for them to go into shelters. (*See*, *e.g.*, Plaintiffs' Motion at pp. 14 -16.) Plaintiffs argue that, for those who find "all bunk beds taken," or those with disabilities, the Bulb transition plan immediately criminalizes these individuals. Plaintiffs' position flows from unfounded assumptions and speculation. First, Plaintiffs assume that the thirty beds presently offered by the City will immediately be filled by the persons at the Bulb. Even indulging for the moment that the assumption is reasonable, Plaintiffs implicitly speculate that the City would not offer additional transitional shelter for persons at the Bulb if the need arose. Furthermore, plaintiffs make no showing that persons currently residing at the Bulb

-8-

1 will not be able to find housing other than the City's transitional shelters. Plaintiffs
2 also cite no statistics from local shelters regarding occupancy of shelter space.
3 In summary, plaintiffs fail to show that the City would violate the Eighth
4 Amendment by issuing a citation to any person who could not find housing other
5 than the City's temporary shelters (assuming that to be so), and who then refused to
6 live in the City's temporary shelters, preferring instead to remain at the Bulb.
7 Plaintiffs have not demonstrated a likelihood of success on their Eighth Amendment
8 claim.

### B. Plaintiffs Fail To Show A Likelihood Of Success On Their Americans With Disabilities Act Claim.

Under Title II of the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. section 12132. The federal regulations implementing Title II require public entities "to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. section 35.130, subd. (b)(7). The "reasonable modification" requirement in the ADA mirrors the requirement in the Fair Housing Amendments Act (FHAA) that public entities "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. section 3604(f)(3(B). Thus, "[t]he requirements for reasonable accommodation under the ADA are the same as those under the FHAA." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). *See also McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) (*McGary*) ("Although Title II of the ADA

1  uses the term "reasonable modification," rather than "reasonable accommodation"
2  [under the FHAA], these terms create identical standards."). Accordingly, the
3  principles in the Fair Housing Act and ADA hybrid cases discussed in the next
4  paragraph apply with full force to the ADA reasonable accommodation claim
5  asserted by plaintiffs here.

6  The Ninth Circuit has "recognized that the question of what constitutes a
7  reasonable accommodation under the ADA 'requires a fact-specific, individualized
8  analysis of the disabled individual's circumstances and the accommodations that
9  might allow him to meet the program's standards.' [Citation.]" *McGary*, 386 F.3d at
10 1270 (involved both FHAA and ADA claims). Under the ADA and FHAA, "only
11 *reasonable* accommodations that do not cause undue hardship or mandate
12 fundamental changes in a program are required." *Giebeler v. M&B Associates*, 343
13 F.3d 1143, 1154 (9th Cir. 2003) (italics original). "To prove that an accommodation
14 is necessary, 'plaintiffs must show that, but for the accommodation, they likely will
15 be denied an equal opportunity to enjoy the housing of their choice.' [Citation.]" *Id.*
16 at p. 1155. "The concept of necessity requires at a minimum the showing that the
17 desired accommodation will affirmatively enhance a disabled plaintiff's quality of
18 life by ameliorating the effects of the disability." *United States v. City of Chicago*
19 *Heights*, 161 F.Supp.2d 819, 834 (N.D.Ill. 2001).

20 Assuming only for the sake of argument in this opposition brief that the ADA
21 even applies to the City's transitional housing, plaintiffs here have not requested, nor
22 do they assert they have requested, any accommodation as an alternative to the
23 transitional housing the City provides. Instead, they simply assert that the
24 transitional housing will not be suitable for some of them because of their
25 disabilities. Without plaintiffs having even requested any accommodation, this Court
26 cannot possibly determine whether a particular accommodation is reasonable or
27 whether it would cause undue hardship to the City or mandate a fundamental change
28 in the City's land use and zoning policies. The Court also cannot determine whether

whatever desired accommodation plaintiffs might have in mind would affirmatively enhance their quality of life by ameliorating the effects of their disabilities. This is so whether plaintiffs wish to remain at the Bulb (which would not be a reasonable accommodation under any circumstances) or whether plaintiffs would like the City to provide alternative housing. Furthermore, plaintiffs overlook the fact that the City also provides information to them regarding homeless shelters in the region.

For these reasons, plaintiffs have not shown they are likely to succeed on their claim that the City of Albany has failed to make reasonable accommodations in its transitional housing for disabled persons currently living at the Bulb.

### C. Plaintiffs Fail To Show A Likelihood Of Success On Their Substantive Due Process Claim.

Substantive due process prohibits "the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (internal citations and quotations omitted). Government violates substantive due process only when its actions "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). Plaintiffs allege that enforcement of the City's ordinance violates substantive due process, by knowingly subjecting Bulb residents to danger to their physical health and safety. See Motion for TRO at pp. 19-20; *See also, Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977) (the Constitution protects a citizen's liberty interest in one's bodily security). To allege a violation of substantive due process for a threatened state-created danger, courts consider (1) whether the danger was affirmatively created by state action, and (2) whether the state acted with deliberate indifference to a known danger. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062-64 (9th Cir. 2006) (*Kennedy*). Plaintiffs have not shown a likelihood of success on either factor.

### 1. The City Does Not Create Danger By Offering Temporary Housing To Plaintiffs.

In examining whether the City affirmatively places plaintiffs in danger, the court "must examine whether [the City] left the person in a situation that was more dangerous than the one in which they found him." *Kennedy*, 439 F.3d at 1062. The conditions at the Bulb, where plaintiffs currently reside, are deplorably unsafe and hazardous. Accordingly, plaintiffs must show that the transitional housing provided by the City places them in an even more dangerous situation. This, they fail to do. Plaintiffs offer only speculation that the City's transitional housing could lead to illness and aggravate the conditions associated with their disabilities. They have not supplied any concrete evidence that living in the transitional housing would be more dangerous than the demonstrably dangerous conditions at the Bulb.

Plaintiffs further assert that "around 30 Bulb residents" will be evicted from the Bulb around the time that winter approaches. See Motion for TRO, at pp. 19-20. But plaintiffs' contention that this places them in danger overlooks that the City provides them with shelter. To the extent plaintiffs are concerned that the City's transitional shelters will be insufficient to house all persons living at the Bulb, plaintiffs have not shown that any in their group will be unable to find alternative shelter, nor have they shown that the City would not consider supplying additional transitional shelters. Where, as here, the City provides voluntary transitional housing for Bulb inhabitants who currently reside in dangerous conditions, plaintiffs fail to show that the City creates a situation even more dangerous than the one in which they currently live.

### 2. The City Has Not Acted With Deliberate Indifference To A Known Danger.

Turning to deliberate indifference, the Court "must decide the related issues of whether the danger to which the defendant exposed plaintiff 'was known or obvious, and whether [defendant] acted with deliberate indifference to it." *Kennedy*, 439 F.3d

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EX PARTE MOTION AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
10000-0274\1663308v1.doc

at 1064. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). Plaintiffs cannot show that the City's Bulb Transition Plan treats Bulb inhabitants with deliberate indifference to a know danger. First, as noted above, plaintiffs fail to show that the City has created any danger. Second, plaintiffs fail to show that any conditions of their transitional housing pose known or obvious dangers; as noted above, plaintiffs offer only speculation. Plaintiffs fail to show that the City acts with deliberate indifference to a known danger.

### D. **Plaintiffs Fail To Show A Likelihood Of Success On Their Procedural Due Process Claim**

A "procedural due process claim hinges on proof of two elements: (1) a protectable liberty or property interest; and (2) a denial of adequate procedural protections." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005). The City acknowledges that residents at the Bulb are entitled to procedural due process protections with respect to their possessions. The City affords those protections.

Plaintiffs contend that the City must grant the same due process procedural protections to the Bulb inhabitants and their "shelters" as the City would grant to any other resident whose "home" it seeks to condemn. Motion for TRO at p. 20. The City will afford the same process to structures at the Bulb as it affords to other structures under the City's Building Code, as explained above.

Plaintiffs also speculate that the City will seize and destroy their personal possessions without any notice at all. Plaintiffs are wrong. First the City will provide seven days' notice to all residents at the Bulb that their possessions will be placed in storage for a period of at least 120 days. The City's seven-day notice procedure that it will store (not destroy) plaintiffs' property for 120 days readily satisfies due process. *See De-Occupy Honolulu v. City and County of Honolulu*,

-13-

2013 U.S. Dist. Lexis 71968, *16-17 (D. Haw. 2013) (court upheld removal of personal possessions from public property where ordinance (1) provided 24 or 72-hours' written notice before items were seized; (2) provided post-seizure notice describing items removed and location of retrieval, and (3) provided for holding seized items at least 30 days before destruction.)

Plaintiffs fail to show that the City will violate any of their procedural due process rights because (i) the City will afford plaintiffs the same procedural rights afforded to other structures under the City's Building Code, and (ii) any personal property seized pursuant to the Bulb Transition Plan will likewise be afforded due process. As a result, plaintiffs fail to make a showing of likely success on the merits.

### E. Plaintiffs Fail To Show A Likelihood Of Success On Their Right To Privacy Claim.

The California unconstitutional conditions doctrine provides that where the "receipt of a public benefit is conditioned upon the waiver of a constitutional right, the government bears a heavy burden of demonstrating the practical necessity for the limitation." *Robbins v. Superior Court*, 38 Cal.3d 199 (1985) (internal quotation marks omitted). Contrary to plaintiffs' assertion, the doctrine does not apply here. First, the City has not conditioned the receipt of a public benefit upon the waiver of anything. The City offers transitional housing to residents of the Bulb who will no longer be permitted to live there. People are prohibited from living at the Bulb because of the City's anti-camping ordinance. Thus, regardless of whether a resident of the Bulb decides to live in transitional housing, that resident may not live at the Bulb as a matter of local law. The City is not saying that a resident may live at the Bulb, but if the resident chooses to live in transitional housing, the resident then may no longer live at the Bulb. Accordingly, the City has not conditioned habitation in transitional housing upon vacating Bulb property. Plaintiffs must vacate Bulb property in any event. The unconstitutional conditions doctrine does not apply here.

Second, the unconstitutional conditions doctrine would required plaintiffs to establish that the City has infringed a constitutional right. *Parrish v. Civil Service Com.*, 66 Cal.2d at 270. But there are not constitutional rights, privacy or otherwise, inherent in plaintiffs occupancy of the Bulb. Plaintiffs allege violation of an associational right to live in a particular location and to choose their own living companions. *See* Motion for TRO at p. 23. The "[freedom] to associate with people of one's choice is a necessary adjunct to privacy in the family and the home." *People v. Katrinak*, 136 Cal.App.3d 145, 153 (1982). Plaintiffs allege an illegal burden of their right to privacy in their "dwellings" on the Bulb, based primarily on the purported sophistic choice between waiving a right to privacy by accepting the City's temporary shelter, or risking criminal sanctions by sleeping on the City's streets. *See* Motion for TRO at p. 22. But, as noted above, plaintiffs are not required to make such a choice. The City offers transitional housing on a voluntary basis. Bulb inhabitants are free to seek other shelters throughout the area. Plaintiffs argue that the combination of high numbers of homeless people combined with lower numbers of shelter beds show impossibility for obtaining alternative shelter. However, Plaintiffs cite no statistics regarding occupancy of local shelters and fail to show that plaintiffs would be prevented from obtaining alternative shelter should they choose not to associate with other residents in the City's transitional housing. Further, no resident who declines to accept the City's temporary housing will be cited if alternative housing is unavailable. Thus, Plaintiffs fail to show that the City is forcing Bulb inhabitants to associate with anyone other than of their own choosing. Rather, the City is merely moving lawfully to evict in a particular location of the City.

In asserting a right to associate freely, plaintiffs fail to show a reasonable expectation of privacy at illegal campsites on the public open space. Plaintiffs' claims of privacy are based on a presumption that Bulb inhabitants have exclusive permanent property rights to campsites at the Bulb. Indeed, plaintiff cites cases

extending the right to privacy to lawful residences. *See, e.g., Hill v. NCAA*, 7 Cal. 4th 1 (1994); *CALHO v. City of Santa Monica*, 88 Cal. App. 4th 451, 459 (2001) ("In short, the right to privacy includes the right to be left alone in our homes."). However, as held in *Zimmerman v. Bishop Estate*, 25 F.3d 784 (9th Cir. 1993), rights to privacy for squatters may be limited. *Id.* at 787-88 (squatter in a residential home did not have an objectively reasonable expectation of privacy where the squatter had no legal right to occupy the home). Instead, the City, "has no constitutional obligation to make accommodations on or in public property available to the transient homeless to facilitate their exercise of the right to travel," *Tobe v. City of Santa Ana*, 9 Cal.4th 1069, 1103 (1995), citing *Lindsey v. Normet*, 405 U.S. 56, 74 (1972), and there is no fundamental right to camp on public property. *Tobe*, 9 Cal.4th at 1108. As a result, Plaintiffs fail to demonstrate a violation of a constitutional right to associate or to privacy.

## V. CONCLUSION

For all of the foregoing reasons, the ex parte motion should be denied.

Dated: November 15, 2013

Respectfully submitted,

RICHARDS, WATSON & GERSHON
 A Professional Corporation
GREGORY W. STEPANICICH
T. PETER PIERCE
TOUSSAINT S. BAILEY

By: /s/
TOUSSAINT S. BAILEY
Attorneys for Defendants