JAMES G. GILLILAND, JR. (SBN 107988)
jgilliland@kilpatricktownsend.com
MAUREEN A. SHEEHY (SBN 129859)
msheehy@kilpatricktownsend.com
BENJAMIN KLEINMAN-GREEN (SBN 261846)
bkleinman-green@kilpatricktownsend.com
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA  94111
Telephone:  (415) 576-0200
Facsimile:   (415) 576-0300

WILLIAM E. MOSLEY (SBN 280495)
wmosley@kilpatricktownsend.com
MATTHEW J. MEYER (SBN 284578)
mmeyer@kilpatricktownsend.com
KILPATRICK TOWNSEND & STOCKTON LLP
1080 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 326-2400
Facsimile:   (650) 326-2422

OSHA NEUMANN (SBN 127215)
oshaneumann@gmail.com
ELISA DELLA-PIANA (SBN 226462)
edellapiana@ebclc.org
CHRISTOPHER A. DOUGLAS (SBN 239556)
cdouglas@ebclc.org
EAST BAY COMMUNITY LAW CENTER
3130 Shattuck Avenue
Berkeley, CA 94705
Telephone:  (510) 269-6615
Facsimile:   (510) 849-1536

PATRICIA E. WALL (SBN 142476)
pwall@homelessactioncenter.org
DAVID P. WAGGONER (SBN 242519)
dwaggoner@homelessactioncenter.org
RON S. HOCHBAUM (SBN 282344)
rhochbaum@homelessactioncenter.org
HOMELESS ACTION CENTER
3126 Shattuck Avenue
Berkeley, CA 94705
Telephone: (510) 540-0878
Facsimile: (510) 540-0403

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE CODY; PATRICIA MOORE; ROBERT WHARTON; APRIL ANTHONY; LARRY CABRERA; JOSEPH ROSE; STEPHANIE RINGSTAD; ALEXANDER WILSON; TAMARA ROBINSON; PHILLIP LEWIS; AMBER WHITSON; BOB ANDERSON; CHESTER HILL; DANIELLE EVANS; DAVID JUSTUS; DONALD BOWEN; GLENN BACHELDER; JOSEPH WALTER, JR.; MARC MATTONEN; MICHAEL NELSON; THOMAS BARNETT;  GARY AMAR; JAMES BAILEY; KRISTOPHER SULLIVAN; LEWANDA PARNELL; ANTHONY BEAMON; ZUBER AWAD; CHRIS DUNCAN; JERMAIN COLEMAN; and ALBANY HOUSING ADVOCATES, a California non-profit public benefit corporation, <br><br>          Plaintiffs, <br><br>     v. <br><br> CITY OF ALBANY; ALBANY POLICE DEPARTMENT; and MIKE MCQUISTON, in his official capacity as Chief of Police, <br><br>          Defendants. | **CASE NO. 3:13-CV-5270-CRB** <br><br> **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |



1    Plaintiffs Katherine Cody, Patricia Moore, Robert Wharton, April Anthony, Larry Cabrera,

2   Joseph Rose, Stephanie Ringstad, Alexander Wilson, Tamara Robinson, Phillip Lewis, Amber

3   Whitson, Bob Anderson, Chester Hill, Danielle Evans, David Justus, Donald Bowen, Glenn

4   Bachelder, Joseph Walter, Jr., Marc Mattonen, Michael Nelson, Thomas Barnett, Gary Amar,

5   James Bailey, Kristopher Sullivan, Lewanda Parnell, Anthony Beamon, Zuber Awad, Chris

6   Duncan, Jermain Coleman, and Albany Housing Advocates (collectively, "Plaintiffs"), for their

7   complaint against defendants the City of Albany, Albany Police Department, and Mike

8   McQuiston, in his official capacity as Chief of Police (collectively, "Defendants"), hereby allege

9   as follows:

10                                **NATURE OF THE ACTION**

11    1.    The City of Albany ("Albany" or "the City") — which does not have a single

12   permanent shelter, transitional house, or available unit of subsidized housing — has begun the

13   process of evicting a community of between 50 and 60  homeless people from the 40 acre tip of a

14   former landfill where they have lived for many years.  The landfill forms a peninsula that sticks

15   out into San Francisco Bay.  Its tip, where people live, is known as "the Bulb." The eviction is

16   taking place just as the rainy season has begun, winter approaches, and temperatures have fallen

17   below freezing.  As Albany proceeds with its eviction, the news reports that five homeless people

18   froze to death—four in San Jose and one in Hayward.

19    2.    The community of homeless people the City plans to evict has existed on the Bulb

20   for many years with, at a minimum, the tacit—and often explicit—permission of the City and the

21   Albany Police Department.  A number of the Bulb's residents were directed to the Bulb by police

22   officers from the City and surrounding jurisdictions.[1]  Based on the understanding that the City

23   and its police force approved of their presence on the Bulb, residents erected tents and other

24   structures to shelter themselves from the elements and created an area of privacy for themselves.

25   In reasonable reliance on the permission of the City, residents have brought personal property to

---

27   [1] In addition to directing Albany's homeless to the Bulb, Albany police officers have, for a
number of years, routinely visited the Bulb and greeted the homeless people living there.  The
28   City's Chief of Police also previously publicly stated that the police were directed by the City not
to enforce the "anti-camping" ordinance at issue in this Complaint.



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                              - 1 -

1   the Bulb, which they use in their daily life.  These activities have been well-known to the City for

2   many years.

3           3.      At its May 6, 2013 meeting, the Albany City Council voted to instruct the police to

4   begin enforcing the City's no camping ordinance (Albany Municipal Code Chapter 8-4) as of

5   October 2013.  The enforcement of that ordinance will have the effect of evicting residents of the

6   Bulb community not only from the Bulb, but from the City in its entirety, as the ordinance (1)

7   applies to all "open space" in Albany—including parks, recreational areas, and the waterfront—

8   and (2) prohibits not only "camping," but also "loitering" and "lodging" (all three undefined in the

9   ordinance).[2]  The "anti-camping" ordinance had not been enforced for many years.  The Council's

10  vote represented a highly prejudicial and untimely shift from the City's prior policy of at least

11  allowing—and in some instances, encouraging—the presence of the Bulb community within the

12  City.

13          4.      At its October 21, 2013 meeting, the Albany City Council voted to adopt a program

14  for transitioning people from the Bulb that included opening a "transitional shelter" for six months

15  with space for 30 people in two portable trailers located on the access road to the Bulb.  These

16  portable trailers offer no privacy, are inaccessible to a majority of Bulb residents due to their

17  disabilities, and have been largely empty since they opened.

18          5.      The City's enforcement of its no camping ordinance without provision of a

19  reasonable and accessible alternative will expel people living on the Bulb from their homes, and

20  ultimately drive them out of the City.  If those who cannot access the "transitional shelter" or

21  remain in Albany after it is closed try to sleep in any open space in Albany, they will be in

22  violation of the anti-camping ordinance.  If they try and sleep on the sidewalk, they will be

23  threatened with arrest if they do not get up and move.  They will have no choice but to relocate to

24  neighboring jurisdictions to avoid citation or arrest—jurisdictions which do not have enough

25  housing and shelter for their own homeless residents.

26

27  _____

28      [2] At a later meeting the Council voted to amend the ordinance to delete the prohibition on
    loitering.



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                              - 2 -

6.      The effects of driving the people now living on the Bulb from their homes and shelters at the beginning of the rainy season—without providing those people any viable alternative—will be devastating.  A great number of the Bulb's residents have been homeless for many years.  A majority are mentally and/or physically disabled.  Some are terminally ill.  Many will be forced into situations which threaten their health and safety.  Many of the people living on the Bulb have experienced crime and harassment living on the streets.  The Bulb has been the only place they have felt safe, and the only place where they have had a community that supports them.

7.      Chronic homelessness and disability constitute significant obstacles to obtaining permanent housing and supportive services.  Some Bulb residents have no income at all; others lack sufficient income to secure housing in the Bay Area without a subsidy or other financial support.  Some lack any form of legal identification.  Many have no rental history.  These facts have been well-known to the City.  Its program for transitioning people from the Bulb into alternative housing did not, however, take the obstacles they face into account.  The City's contemplated timeline for evicting residents of the Bulb does not afford them a realistic prospect of finding appropriate alternative housing.

8.      This is an action brought by and on behalf of people who reside at the Bulb, who face eviction from the homes in which they have lived for many years with the permission, or at least acquiescence, of the City, and where they have enjoyed a reasonable expectation of privacy.  All that they now have will be taken away from them.  By expelling them as temperatures fall below freezing and the rains come, with no access to acceptable shelter, the City places their lives at risk.  Their property will be seized, their homes destroyed.  They will have three choices:  If they are willing to give up their privacy, and if their disabilities do not prevent them, *and* if there is room, they can go into a portable trailer where they will have a bunk bed for six months.  If they are unable to go into the portable trailer, they can either risk almost certain arrest by staying in Albany, or get out of town.  A fourth choice, to find affordable long term alternative housing, is foreclosed because of the imminence of the eviction.  Finally, after six months, there will be *no* place where a homeless person can legally sleep or shelter from the elements within the City.

9.      The City's plan to enforce the anti-camping ordinance against the homeless



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                              - 3 -

individuals who shelter at the Bulb violates rights afforded Plaintiffs under the United States Constitution, the Constitution of the State of California, and federal and state law.  Plaintiffs bring this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.  Defendants, under color of state law, intend, on an ongoing basis, to violate Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1 and 7 of the California Constitution,  as well as Title II of the ADA, the Fair Housing Act, California's Fair Employment and Housing Act, and related statutes.  Plaintiffs seek this relief to enjoin Defendants from proceeding with their plan to effect the mass eviction of the City's homeless population through enforcement of Albany Municipal Code § 8-4.

## PARTIES

10.     Plaintiff Katherine Cody lives on the Bulb in Albany, California.  She is homeless within the federal definition provided by 42 U.S.C. §11302.  Ms. Cody is terminally ill and suffers from debilitating physical and mental conditions that limit her ability to work.  Ms. Cody was the victim of a violent crime in the 1990s in which she lost her spleen, and many of her conditions stem from that incident and the poor medical treatment she received afterwards.  Because she is medically vulnerable, and as a result of her mental condition, Ms. Cody would not be able to stay in the portable trailers or receive the benefits provided to those who stay there, and would be at risk if she were required to leave the portable trailers during the day.  Ms. Cody first came to the Bulb in 2007.  She left for a time in 2009 to live first in a housing cooperative and then in a van.  Eventually, while still living in her van, Ms. Cody was instructed by Albany police to return to the Bulb.  Ms. Cody returned to the Bulb and has resided there since 2010.  She has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

11.     Plaintiff Patricia Moore lives on the Bulb in Albany, California.  She is homeless within the federal definition provided by 42 U.S.C. §11302.  Ms. Moore is 56 years old and worked for many years as a physical therapist.  She has resided at the Bulb since 2010 except for a two month period in 2013 when she was in a hospital and nursing facility.  Ms. Moore has made her home in a shelter with tarp-covered wooden walls, a tarp roof, and rugs on the floor.  Illness



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                        - 4 -

1    and injury now limit her ability to continue her work.  Ms. Moore has a long history of trauma

2    related to institutional settings, and is still medically weak from a recent hospitalization.  Her

3    disabilities would make it very dangerous for her to be in the close quarters of the portable trailers

4    and she requires an accommodation to access the City's homeless program. She has sought and

5    continues to seek assistance to locate housing other than on the Bulb, but all such efforts remain

6    unsuccessful to date.

7          12.     Plaintiff Robert Wharton lives on the Bulb in Albany, California.  He is homeless

8    within the federal definition provided by 42 U.S.C. §11302.  Mr. Wharton suffers from

9    debilitating physical and mental conditions that limit his ability to work.  Mr. Wharton cannot live

10   in the close quarters of the portable trailers and would need an accommodation as a result of his

11   PTSD, depression, and psychosis.  Mr. Wharton has lived at the Bulb on and off since 1993.  Mr.

12   Wharton was first directed to the Bulb by Albany police in 1993 and was directed back to the Bulb

13   by Albany police again in 2012.  Mr. Wharton has sought and continues to seek assistance to

14   locate alternative housing that he can afford on his limited Social Security Income, but all such

15   efforts remain unsuccessful to date.

16         13.     Plaintiff April Anthony lives on the Bulb in Albany, California.  She is homeless

17   within the federal definition provided by 42 U.S.C. §11302.  Ms. Anthony's family moved to the

18   City of Albany in 1969.  She has been unable to find a place to live in Albany or any of the

19   surrounding cities.  Ms. Anthony suffers from bipolar disorder, anxiety, and depression, as well as

20   physical ailments that make it difficult for her to walk.  She would not be able to access the

21   portable trailers or avail herself of any of the benefits provided to those who stay there because of

22   her disabilities.  Ms. Anthony does not have a regular source of income.  She has sought and

23   continues to seek assistance to locate housing other than the Bulb, but all such efforts remain

24   unsuccessful to date.

25         14.     Plaintiff Larry Cabrera lives on the Bulb in Albany, California.  He is homeless

26   within the federal definition provided by 42 U.S.C. §11302.  Mr. Cabrera has resided at the Bulb

27   since 2010.  Mr. Cabrera worked for many years as a journeyman contractor and asbestos

28   abatement supervisor, but was unable to continue working due to a physical disability, the result of



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                          - 5 -

1    permanent lung damage from asbestos exposure.  As a result of his condition, Mr. Cabrera is

2    medically vulnerable and particularly at risk of harm from airborne diseases.  He cannot safely

3    stay in the portable trailers or avail himself of the benefits provided to those who do.  Mr. Cabrera

4    has sought and continues to seek assistance to locate housing other than at the Bulb, but all such

5    efforts remain unsuccessful to date.  One organization under contract with the City offered to buy

6    Mr. Cabrera a one-way bus ticket out of Albany if he was willing to leave.  Mr. Cabrera has

7    nowhere else to go.

8         15.    Plaintiff Joseph Rose lives on the Bulb in Albany, California.  He is homeless

9    within the federal definition provided by 42 U.S.C. §11302.  Mr. Rose has resided at the Bulb

10   since February 2008.  He became homeless after losing his home to foreclosure.  Mr. Rose

11   receives disability benefits because of a physical injury to his hip which has severely limited his

12   mobility.  He has to lie down during much of the day and night.  Since the City's planned shelter

13   will be closed during the day, Mr. Rose will need an accommodation that allows him to shelter 24

14   hours a day.  He has been on the waiting list for Section 8 housing for three years.  Mr. Rose has

15   sought and continues to seek assistance to locate housing other than at the Bulb, but all such

16   efforts remain unsuccessful to date.

17        16.    Plaintiff Stephanie Ringstad lives on the Bulb in Albany, California.  She is

18   homeless within the federal definition provided by 42 U.S.C. §11302.  Ms. Ringstad became

19   homeless after losing her home to foreclosure.  She has lived at the Bulb since approximately

20   2008.  Her current home, a large tent, has provided her with shelter and privacy since then.  Ms.

21   Ringstad has a history of trauma, including sexual assault, and as a result, cannot feel safe or be

22   mentally healthy sleeping in the close quarters of the portable trailers.  Ms. Ringstad has sought

23   and continues to seek assistance to locate housing other than at the Bulb, but all such efforts

24   remain unsuccessful to date.

25        17.    Plaintiff Alexander Wilson lives on the Bulb in Albany, California.  He is homeless

26   within the federal definition provided by 42 U.S.C. §11302.  With the full knowledge and implicit

27   permission of Albany officials, Mr. Wilson created his home at the Bulb using rocks, wood, mud,

28   and glass and has lived there for more than five years.  Mr. Wilson suffers from debilitating



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                  - 6 -

1 physical conditions that limit his ability to work. He suffers from claustrophobia and mania,

2 among other disabilities. Mr. Wilson also has a seizure disorder and needs his service dog with

3 him to both prevent seizures and alert him if a seizure is coming. He would not be able to access

4 the portable trailers. Mr. Wilson has sought and continues to seek assistance to locate housing

5 other than at the Bulb, but all such efforts remain unsuccessful to date.

6       18.    Plaintiff Tamara Robinson lives on the Bulb in Albany, California. She is

7 homeless within the federal definition provided by 42 U.S.C. §11302. With the full knowledge

8 and implicit permission of Albany officials, Ms. Robinson has lived at the Bulb for the past three

9 years. Ms. Robinson suffers from serious, life-threatening disabilities. She is HIV positive and

10 has hepatitis C. Because she is immunosuppressed, she is particularly medically vulnerable to

11 airborne diseases and at risk if she stays in a closed space with many other people. Ms. Robinson

12 would not be able to stay in the portable trailers without placing her health at risk, and so would

13 not be able to avail herself of any of the benefits provided to those who utilize the shelter. She has

14 been threatened with citation by the Albany police for sleeping on city sidewalks.

15       19.    Plaintiff Phillip Lewis lives on the Bulb in Albany, California. He is homeless

16 within the federal definition provided by 42 U.S.C. §11302. Mr. Lewis is a military veteran who

17 has resided at the Bulb since approximately 2005. With the full knowledge and implicit

18 permission of Albany officials, Mr. Lewis has created a home for himself and his partner at the

19 Bulb using materials he found or scavenged, including rocks, boulders, and tree branches. Mr.

20 Lewis suffers from substantial mental disabilities, including major depression, schizoid

21 personality disorder, and the effects of a significant trauma history. His disabilities preclude him

22 from utilizing the shelter in the portable trailers or receiving the benefits provided to those who

23 stay there.

24       20.    Plaintiff Amber Whitson lives on the Bulb in Albany, California. She is homeless

25 within the federal definition provided by 42 U.S.C. §11302. She has resided at the Bulb with her

26 partner Phillip Lewis since 2006. With the full knowledge and implicit permission of Albany

27 officials, she and Mr. Lewis have created a home for themselves at the Bulb using materials they

28 found or scavenged, including rocks, boulders, and tree branches. Ms. Whitson suffers from



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB            - 7 -

obsessive compulsive disorder, claustrophobia, chronic fatigue, chronic dyspepsia, sciatica, and myoclonic seizures.  Because of these disabilities, Ms. Wilson cannot live in small spaces with many other people, must eat a special diet, and must lay down to rest during the day.  She cannot utilize the portable trailers or avail herself of the benefits or services provide to those who utilize the portable trailers.

21.     Plaintiff Bob Anderson lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Anderson has lived at the Bulb since about 2011.  Before then, he lived with his mother in Berkeley.  When she died, he could not find affordable housing and could not survive sleeping on the streets or sidewalk, so he moved to the Bulb.  Mr. Anderson suffers from bipolar disorder and paranoid schizophrenia, which are exacerbated by close contact with large numbers of people.  Because of these disabilities, Mr. Anderson cannot stay in the portable trailers or utilize the other benefits the City of Albany has proposed.

22.     Plaintiff Chester Hill lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Hill has lived at the Bulb for about fourteen years.  During that time, and with the full knowledge and implicit permission of Albany officials, Mr. Hill has built a shelter made up of a tent, tarps, cedar logs, a door, and concrete floors.  Mr. Hill suffers from claustrophobia and panic attacks.  Because of these conditions, he cannot stay in the portable trailers the City of Albany proposes, and cannot make use of the benefits that are available to those who can live in the portable trailers.

23.     Plaintiff Danielle Evans lives on the Bulb in Albany, California.  She is homeless within the federal definition provided by 42 U.S.C. §11302.  Ms. Evans has lived at the Bulb for about fifteen months.  During that time, with the full knowledge and implicit permission of Albany officials, Ms. Evans and her partner have built a shelter of cement slabs and wood, and powered by solar panels and two gas generators.  Ms. Evans suffers from bipolar disorder and depression.  Because of these disabilities, she cannot live in close quarters with large numbers of other people and cannot stay in the portable trailers the City of Albany proposes, and cannot make use of the benefits that are available to those who can live in the portable trailers.



24.     Plaintiff David Justus lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He is 55 years old and has lived at the Bulb since 2010.  Before then, he worked for twenty years as a tool and die maker and obtained a degree in graphic design.  Mr. Justus suffers from depression and paranoid schizophrenia.  Because of these disabilities, Mr. Justus cannot live in the portable trailers or make use of the other services available to those who can.

25.     Plaintiff Donald Bowen lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He has lived at the Bulb since 2011.  Mr. Bowen suffers from terminal liver disease induced by hepatitis C, the effects of multiple gunshot wounds, and is waiting for confirmation from his doctor that he has liver cancer.  Because he is immunosuppressed, he cannot live in close quarters with other people and must lie down and rest for much of the day.  He cannot live in the portable trailers the City of Albany proposes, and cannot make use of the benefits and services that those living in those shelters enjoy.  Mr. Bowen has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

26.     Plaintiff Glenn Bachelder lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He has lived at the Bulb since 2006, with the exception of six months in 2010 when he lived in a warehouse in Berkeley.  Mr. Bachelder suffers from extreme anxiety in enclosed spaces and suicidal tendencies.  Because of his disability, he cannot live in the portable trailers.  He has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

27.     Plaintiff Joseph Walter, Jr. lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Walter first began living on the Bulb in 2001 and has lived there uninterrupted since 2004. He suffers from panic attacks in enclosed spaces and requires emotional support animals.  Because of these disabilities, Mr. Walter cannot live in the portable trailers.

28.     Plaintiff Marc Mattonen lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Mattonen has lived at the Bulb for



most of the past twenty years.  During that time, and with knowledge and implicit approval of the City of Albany, he has built a home out of cement and cement slabs.  Mr. Mattonen suffers from paranoid schizophrenia and claustrophobia.  Because of this disability, he cannot live in the portable trailers.  He has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

29.     Plaintiff Michael Nelson lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.   He has lived at the Bulb since 2009.  Mr. Nelson has been diagnosed with post-traumatic stress disorder, anxiety, and attention deficit disorder.  Because of these disabilities, he cannot live in enclosed spaces like the portable trailers.

30.     Plaintiff Thomas Barnett lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Barnett has lived at the Bulb for six years, when he was directed to move there by the Albany police.  During that time, he has built a shelter out of plywood, tarps, and a camper shell.  He suffers from schizophrenia, anxiety, claustrophobia, and Hepatitis C.  Because of these disabilities, Mr. Barnett has panic attacks in enclosed spaces, is very vulnerable to diseases carried by those around him, and must eat a special diet.  For these reasons, he cannot live in the portable trailers or make use of the services available to those who do.  He has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

31.     Plaintiff Gary Amar lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He has lived at the Bulb since 2011.  He suffers from post-traumatic stress disorder, depression, and anxiety.  He cannot be around bright lights or be in confined spaces.  Because of these disabilities, he cannot live in the portable trailers.  He has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

32.     Plaintiff James Bailey lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He has lived on the Bulb off and on for 20 years. He suffers from Hepatitis C, and post-traumatic stress disorder.  He has panic attacks when he is locked into enclosed spaces.  He cannot live in the portable trailers.



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                                                      - 10 -

33.     Plaintiff Kristopher Sullivan lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  Mr. Sullivan has been living at the Bulb for about a year and a half.  He suffers from post-traumatic stress disorder, anxiety, and panic attacks and relies on a service animal to deal with depression.  Due to these disabilities, he cannot live in enclosed spaces with others and cannot live in the portable trailers.  Mr. Sullivan has sought and continues to seek assistance to locate housing other than at the Bulb, but all such efforts remain unsuccessful to date.

34.     Plaintiff Lewanda Parnell lives on the Bulb in Albany, California.  She is homeless within the federal definition provided by 42 U.S.C. §11302.  Ms. Parnell has lived at the Bulb since March 2009.  She suffers from a psychotic disorder that prevents her from staying in the portable trailers.

35.     Plaintiff Anthony Beamon lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He suffers from post-traumatic stress disorder and severe depression.  These disabilities make living in enclosed spaces impossible, and require Mr. Beamon to rely on a support animal.  He cannot live in the portable trailers.

36.     Plaintiff Zuber Awad lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He suffers from anxiety and ADHD and has been in treatment for them since the age of five.  His anxiety is triggered by enclosed spaces and he cannot live in the portable trailers.

37.     Plaintiff Chris Duncan lives on the Bulb in Albany, California.  He is homeless within the federal definition provided by 42 U.S.C. §11302.  He has lived at the Bulb since about 2010, in a wood and metal shelter that he built himself.  Before then, he worked for a construction company, but he was forced to leave his job after he developed life-threatening emphysema and Chronic Obstructive Pulmonary Disease.  Without an income, he became homeless.  He suffers from Hepatitis B and the lingering effects of being hit by a car in March 2013.  Because of his lung problems, Mr. Duncan is very vulnerable to common sicknesses and has been hospitalized with life-threatening pneumonia several times in the last few years.  He is at grave risk of catching a sickness from others and cannot share enclosed spaces with groups of people.  For this reason, he cannot live



1   in the portable trailers.  Mr. Duncan has sought, and continues to seek, alternative living

2   arrangements off the Bulb, but his efforts have been unsuccessful to date.

3       38.    Plaintiff Jermain Coleman lives on the Bulb in Albany, California.  He is homeless

4   within the federal definition provided by 42 U.S.C. §11302.  Mr. Coleman is claustrophobic and

5   nocturnal.  He has a history of trauma and suffers from a mental disability which substantially limits

6   his ability to work and live in close proximity with others.  For these reasons, he cannot live in the

7   portable trailers.

8       39.    Plaintiff Albany Housing Advocates ("AHA") is a non-profit public benefit

9   organization that advocates for, *inter alia*, the development and implementation of services that

10  ensure the welfare of Albany's homeless population, such as adequate shelter and housing

11  opportunities.  AHA's members include Amber Whitson, a disabled resident of the Bulb who

12  faces imminent eviction as a result of the City's planned enforcement of Albany Municipal Code

13  §8-4. AHA has a strong interest in preventing the imminent eviction of Ms. Whitson from the

14  Bulb, as well as the Bulb's other residents, consistent with its organizational purpose.

15      40.    Upon information and belief, Defendant City of Albany is a municipal corporation,

16  organized under the laws of the State of California, with the capacity to sue and be sued.  Upon

17  information and belief, the City is the legal and political governmental entity responsible for the

18  actions of the Albany Police Department, its officials, agents, and employees.

19      41.    Defendant Albany Police Department (hereinafter "Department") is the municipal

20  agency responsible for policing the City and for enforcement of the Albany Municipal Code

21  (hereinafter "Code"), including § 8-4 and California Penal Code § 647(e).  Upon information and

22  belief, the Department, through its officials, agents, and employees, has taken steps towards the

23  enforcement of and will enforce Code § 8-4.

24      42.    Defendant Mike McQuiston has been the Chief of Police since July 1, 2006.  In his

25  official capacity as Chief of Police, he directs the administration and operation of the Department

26  pursuant to the Code and guidelines set by the City.  As such, he is responsible for the

27  enforcement of Code § 8-4.  Upon information and belief, under his direction, officials, agents,

28  and employees of the Department have threatened Plaintiffs with camping and obstruction of



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                        - 12 -

1   public way citations.  Chief McQuiston is being sued in his official capacity.

2                          **JURISDICTION**

3         43.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343(a)(3)

4   and (4) and 1367.  Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate rights

5   established by the Fourth and Fourteenth Amendments to the United States Constitution as well as

6   federal law.  Plaintiffs also seek relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and

7   2202.  Plaintiffs' state constitutional and state law claims arise from the same occurrences as their

8   federal constitutional claims and are within the Court's supplemental jurisdiction pursuant to

9   28 U.S.C. § 1367.

10                            **VENUE**

11         44.     Venue in this action is proper in the Northern District of California under 28 U.S.C.

12   § 1391(b), as the Defendants are located in the Northern District of California and all the events,

13   acts, and/or omissions giving rise to the claims complained of herein have occurred or will occur

14   in this District.

15                     **FACTUAL ALLEGATIONS**

16                 **Albany's Anti-Camping Ordinance**

17         45.     Albany Municipal Code section 8-4 provides, in relevant part, that:

18   **8-4.3 Hours of Operation.**

19
20   a. No person shall use, remain in or enter upon any waterfront and Albany Hill area
      between 10:00 p.m. and 5:30 a.m., other than duly authorized City employees,
21   persons participating in City sponsored activities or other activities which the City
      has provided prior written permission to utilize the waterfront area beyond the
22   closing time.  The hours of operation of specific facilities within any waterfront area
      may also be specified by the Director of the Recreation and Community Services
23   Department.

24   **8-4.4 Camping.**

25   No person shall loiter, camp or lodge in any park, recreation, open space, waterfront
      or Albany Hill area.  No person shall set up tents, shacks, sleeping bags or any other
26   shelter within any park, recreation, open space, waterfront or Albany Hill area for the
      purpose of overnight camping.  No person shall leave any tents, shacks, sleeping
27   bags or any other shelter, structure or specialty vehicle to be used or could be used
      for overnight camping,  . . . in any park, recreation, open space, waterfront or
28



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                            - 13 -

Albany Hill area.  The restrictions contained within this section shall not apply to programs sponsored or co-sponsored by the City.

**8-4.7 Unauthorized Activities.**

Unless authorized by permit, it is unlawful to do the following in any park, recreation, open space, waterfront or Albany Hill area:

b. Construct or erect any building of any kind, whether permanent or temporary. …

g. Store personal property.

Subsections 8-4.4 and 8-4.7(b) and (g) apply to all open spaces in Albany.

### Prior Enforcement and Non-Enforcement of the Ordinance

46.     People have been living on the Albany landfill for close to 20 years.  In 1999, there were approximately as many people living on the landfill as there are now.[3]  Upon information and belief, Albany Municipal Code 8-4 was drafted by staff and passed by the Council with the explicit intention that it be used as a tool to remove "individuals occupying public lands on the Albany Landfill."  In 1999, as now, the City's plans to evict homeless people living on the landfill did not include provisions sufficient to ensure that those who were evicted would be able to find shelter or housing in Albany or in any other jurisdiction.  When the mass evictions in 1999 took place, the vast majority of homeless people who had been living on the landfill were forced out of Albany.

47.     In 1999, as in 2013, Albany hired an organization called Operation Dignity to operate a shelter in a portable trailer parked near the entrance to the landfill.  In 1999, as in 2013, a great number of the people living on the landfill had disabilities that were not accommodated by the program to transition them to alternative housing, and the shelter was utilized by only a few.

48.     In most cases, the people who were evicted in 1999 lost all of their property.  Shelters were bulldozed and personal property was thrown in a dumpster.  One man whose right leg had been amputated lost, among other things, his wheelchair, crutches, and arm braces.

---

[3] In 1999, people were living on the entirety of the landfill not just the tip known as the Bulb. Since then, the entirety of the landfill except for the Bulb has been transferred state and is managed by the East Bay Regional Park District.  The Bulb still belongs to the City.



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                              - 14 -

49.     In the only instance in which a person who was issued a citation under the anti-camping ordinance in 1999 sought relief from the courts, Bulb resident Michael Smith was found not guilty on the grounds that he had a defense of necessity, in that, as a person who is homeless, he had no choice but to break a law that criminalized fulfilling the basic human need for sleep and shelter.

50.     After the 1999 eviction homeless people returned to the Bulb, sometimes at the suggestion of the City's police officers.  Enforcement of the ordinance ceased altogether except for brief flurries in 2007 and 2008.

**The Lack of Housing Alternatives in Albany and in Alameda County Generally**

51.     For at least five years before the 1999 eviction, homeless people had been residing on the landfill and they have been residing there ever since.  At no time in that period has the City taken any steps to provide housing or alternative permanent places for landfill residents to sleep or seek shelter.  Though the City is required by state law to make a plan for affordable housing and zone for a homeless shelter in at least one part of the City, it has not.  Albany has been out of compliance with state affordable housing law since at least 1997.

52.     As a result of Albany's failure to provide a permanent shelter and affordable housing, homeless people who wish to sleep and shelter in Albany have no option than to go to the Bulb.  If they lie in a sleeping bag or set up a tent in any other open space in Albany they will be in violation of Albany Municipal Code section 8-4.  If they lie on the sidewalk, they are at the risk of being cited and arrested for lodging or obstructing the sidewalk.

**The City's Current Plan for Eviction of the Homeless**

53.     In 2012, the Albany City Council ("Council") created a Homeless Task Force to "consider homelessness throughout the City including consideration of the unique issues associated with homeless on the Albany waterfront" and develop a solution with the goal that Albany's homeless would be "supportively and permanently housed."

54.     At an Albany City Council meeting on May 6, 2013, the Task Force presented findings from its ongoing study.  Those findings listed a series of options for "Ending Homelessness in Albany."  The Council voted for the option of enforcement of the no camping



ordinance.  The Task Force report had listed as the "cons" of this approach that it "would/could 'push' persons who are homeless to other parts of Albany communities."  At the same meeting, the Council voted to appropriate $30,000 for a consultant to conduct outreach and engagement services to people who are homeless in Albany.  A three month contract to provide those services was subsequently awarded to Berkeley Food and Housing Project (BFHP).

55.     At its September 3, 2013, meeting the City Council reaffirmed its decision to begin enforcement of the ordinance and proceed with the eviction of people from the Bulb despite numerous speakers who made the case for more time to plan alternatives and urged the Council to reconsider.  The Council also voted to extend the contract with BFHP, although, at the time, it had only managed to house one person.

56.     At its October 21, 2013 meeting, the Albany City Council voted to adopt a staff proposal to implement an "Albany Waterfront Park Transition Plan" ("The ACT plan" which stands for "**A**ssistance to homeless including the housing – centered outreach, transitional services, support, and shelter; **C**leanup of the Bulb; and **T**ransition of the Bulb to the McLaughlin East Shore State Park").  The Council adopted the program developed by its staff and voted to appropriate $570,000 to implement the program. $171,000 would be spent on cleanup of their campsites with the remainder to be spent on setting up two portable trailers with bunk beds to serve as a "transitional shelter" for six months as well as the staffing for such a shelter; only $35,000 was allocated for rental subsidies to assist the homeless to move into traditional permanent housing.

57.     Before approving the staff recommended plan, the Council discussed and rejected an alternative proposal by counsel for plaintiffs.  Plaintiffs proposed that instead of spending $250,000 on purchasing and staffing portable trailers, that the money be spent on housing subsidies for Bulb residents.  As part of the proposal all Bulb residents would agree to leave the Bulb six months from the date the proposal was approved, whether they had found housing or not. Plaintiffs consulted with experts in the field of housing for the homeless and estimated that for $250,000 all of the residents of the Bulb could be housed for six months.  They pointed out that "The dormitory-style trailers proposed by the City also have significant health risks for the Bulb



1   residents. Many have histories of trauma. Many have mental health issues and cognitive

2   impairments.  These conditions make congregated living dangerous and traumatizing.

3   Additionally, the physical health risks of spreading illness are far greater in common dorms than if

4   people are in separate tents."

5          58.     Before it approved the Waterfront Park Transition Plan and the appropriations in

6   support of it,  the City had reason to know, and in fact knew, that many disabled Bulb residents

7   would not be unable to utilize the housing-centered outreach, transitional services, support and

8   shelter offered by the Plan.  Evidence of the City's prior knowledge and notice include:

9                  a.   When the City evicted Bulb residents in 1999, it set up similar portable trailers

10                       as a shelter, and hired the same agency to staff it.  Many disabled residents were

11                       not able to use the shelter, and occupancy was very low.  The City was

12                       therefore on notice that its shelter plans were likely to exclude a large number

13                       of prospective occupants.  Upon information and belief, Chief Mike McQuiston

14                       was an Albany police officer during the 1999 eviction.

15                 b.   Counsel for Plaintiffs wrote to the Council on October 7, 2013, outlining the

16                       mental and emotional disabilities of many Bulb residents and explaining why

17                       living in a dormitory-style portable trailer would severely damage their health

18                       and wellbeing.

19                 c.   Defendant Chief McQuiston spoke to a meeting of Albany's Homeless Task

20                       Force on December 20, 2012. Quoting an online source, he informed the Task

21                       Force that 40% of homeless people—the "unable" or "cannots"—suffer from

22                       mental illness, drug addiction, or both, and find it difficult to access services

23                       which other homeless people benefit from.

24                 d.   At a meeting on November 15, 2012, the Task Force reviewed a funding

25                       proposal which the City had previously submitted to an Alameda County grants

26                       program. In that proposal, the City stated that the "mental health issues and

27                       needs" of people living on the landfill "have been largely unacknowledged and

28                       untreated."



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                               - 17 -

e.  The Albany Police Department has had regular contact with Bulb residents over the years and has had first-hand exposure to the disabilities experienced by Bulb residents.

f.  The City's vendor, Berkeley Food and Housing Project ("BFHP"), has visited the Bulb twice weekly since mid-July through September and interviewed a number of Bulb residents about their interest and ability to move into traditional housing. Through their interactions with Bulb residents, the City's agent, and consequently the City itself, was knowledgeable about the physical and mental disabilities experienced by Bulb residents.  In particular, BFHP learned that the sole or primary source of income available to a number of Bulb residents to pay for housing is their disability benefits, thus confirming their status as disabled.

59.  The "transitional shelter" contemplated by the ACT Plan opened on or about November 20, 2013 in two portable trailers located on the access road to the entrance to the landfill.  One of the portable trailers has 22 bunk beds for men; the other has eight beds for women, and a common space for staff and meals.  Shelter rules are strict.  The shelter opens at 5:30 PM and closes at 8 AM.  All clients have to exit the premises at or before closing time.  There are no in and out privileges.  If a client leaves and does not return by 8 PM, he or she will not be readmitted to the shelter.  Personal belongings are required to be kept at a minimum.  Clients can bring in only one bag of personal belongings.  No visitors are allowed.  Animals are not permitted inside the portable trailers. "Lack of cooperation and/or compliance with shelter rules or staff" is grounds for immediate expulsion.  Upon information and belief, neither the showers nor lavatories associated with the portable trailers include ramps to allow use by physically disabled persons.

60.  People who have stayed in the "transitional shelter" report that a camera in the men's portable trailer provides a non-stop video feed of the occupants of the portable trailer to the staff running the shelter in the adjoining trailer, including their conversations and their activities in the portable trailer.

61.  Several people who have attempted to gain access to the "transitional shelter" (including at least one plaintiff) have been denied entrance because they were told by the shelter



operator that they were not on "the list."  On information and belief, BFHP keeps a list of people who have filled out a "Housing Readiness Assessment."  One Bulb resident who was denied access to the "transitional shelter" because he was not on the list had previously contacted a BFHP outreach worker.  The outreach worker would not do an assessment once he learned that the person had no income.  One individual who was not a Bulb resident but who was seeking to determine how Bulb residents could access the shelter was told by a shelter administrator that since his name was not on the list, he had to go to BFHP's office in Berkeley to obtain a voucher.  This information was given at 7 PM, after the close of business, and the shelter worker could not tell this person where BFHP's office was located.  Some Bulb residents have been told by the Albany police that they could get them into the shelter, even though they were not on "the list."

62.  Since the beginning of October, Albany police have sporadically gone out to the Bulb and given a few people at a time warnings that they risk receiving a citation for violation of Albany Municipal Code §8-4.3, which provides that" No person shall use, remain in or enter upon any waterfront  . . . area between 10 PM and 5:30 AM . . ." Many people currently residing on the Bulb have not received such a warning.

63.  At the same time that the City has issued warnings that people will be cited if they remain on the Bulb, it has distributed notices regarding a housing subsidy program towards which it has contributed $35,000.  Its announcement, revised as of October 28, 2013, indicated that to be eligible for the program people would have had to have a Housing Readiness Assessment on file with BFHP as of September 30, 2013.  Many Bulb residents cannot meet this requirement.  An additional requirement is that applicants for assistance have to be able to cover a portion of the rent. Many Bulb residents are unable to do this and have other obstacles to obtaining housing.  As of the filing of this complaint, only four Bulb residents have received housing under this program.

**Current Bulb Residents Who Will Be Affected by the Eviction**

64.  Neither the City of Albany nor BFHP has conducted a formal census of all people living on the Bulb or made a comprehensive attempt to document the needs and resources of all Bulb residents.  Between April and September 13, 2013, Amber Whitson, a Bulb resident, conducted an informal survey of the people living on the Bulb at the time.  She found that sixty-



four people (62 of whom participated in Ms. Whitson's survey: 39 men and 23 women) were

living on the Bulb.  Of the 62 people participating in the survey:

- 35 reported suffering from at least one disability.
- 36 have no income, 21 of whom desire employment.
- 8 are on General Assistance, unemployment, have a job or receive money from other sources.
- 18 (6 women and 12 men) are receiving either Supplemental Security Income (SSI) or Social Security Disability Income (SSDI).
- 48 were interested in finding housing.
- One person reported living on the Bulb 22 years; two people said they had lived there for 20 years; people reported having lived there 8, 9, 10, 14, 15, and 16 years.
- 56 of the current residents of the Bulb have been living there for more than a year.

### Needs of People with Disabilities on the Bulb

65.    Many people living on the Bulb have moderate to severe physical and mental

disabilities, including bipolar disorder, paranoia, HIV, chronic alcoholism, diabetes and

complications thereof, anxiety disorders, and post-traumatic stress disorder.  Many are immuno-

suppressed and/or medically vulnerable as a result of poor nutrition in combination with their other

conditions.  Many cannot work as a result of their disabilities. Others have difficulty finding work

and survive on government assistance, food stamps, scrapping metal, recycling, or doing odd jobs.

66.    Thirty-two Bulb residents have filled out requests for accommodations based on

their disabilities in which they state that they are unable to access the transitional shelter.  Thirty-

one of these requests have been verified by mental health professionals.  These requests and

accompanying verifications have been submitted to the City.

67.    According to the definition provided by the United States Department of Housing

and Urban Development (HUD), the overwhelming majority of people living on the Bulb are

"chronically homeless."  Under the definition employed by HUD, people are considered

chronically homeless if they have been homeless for more than a year, or have had at least four

episodes of homelessness in the last three years, and can be diagnosed with a substance use

disorder, serious mental illness, developmental disability, post-traumatic stress disorder, cognitive

impairments resulting from brain injury, or chronic physical illness or disability.

68.    There is no indication that the City has considered the need to accommodate mental

and physical disabilities of Bulb residents in designing the Waterfront Park Transition Plan,



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                                      - 20 -

1  including the outreach program, the housing subsidy program, or the "transitional shelter." There

2  is no known plan to make reasonable accommodations or modifications to the Plan for people with

3  physical disabilities, or to the "transitional shelter" in particular. Some physically disabled Bulb

4  residents will have trouble getting in and out of bunks, or onto sleeping mats, and will have

5  difficulty accessing the showers and lavatories. Some will need to sleep with, and remain with,

6  their service animals to prevent the deterioration of their conditions. Some will need to lie down

7  during the day. Some medically vulnerable people will need adequate ventilation so that they do

8  not catch airborne diseases that could be life-threatening for someone in their condition.

9        69.    The City has not given any indication that it has made a plan to accommodate

10  people with mental disabilities as part of the Transitional Plan or the "transitional shelters" in

11  particular. People with paranoia need a private space, or limited contact with other people, or they

12  will suffer severe anxiety. People with histories of trauma, who have post-traumatic stress

13  disorder, also need private space to avoid triggering major mental health setbacks. People with

14  cognitive disorders will need flexibility in enforcement of shelter rules, because they do not have

15  the capacity to understand, remember, and follow them. On information and belief, the shelter is

16  not operated by staff who are trained in de-escalation and have enough clinical training and

17  experience to work well with people with mental disabilities.

18  **Plans for Removal of Property and Dwellings from the Bulb**

19        70.    As part of its program for removing people from the Bulb the City has issued a

20  statement of "Administrative Procedures for the Removal of Temporary Shelters, Personal

21  Property, and Refuse Illegally Placed on Public Property . . . ." The Procedures provide that

22  "Approximately fourteen (14) days prior to undertaking a cleanup, the City shall make reasonable

23  efforts to provide informal notice to the inhabitants of an encampment through face-to-face

24  communications and distribution of informational flyers as deemed appropriate." They further

25  provide that "At least seven (7) days prior to undertaking a cleanup, the City shall seek to provide

26  a written notice of the intended cleanup by posting and/or distributing a written notice . . . in a

27  manner which is reasonably calculated to provide effective notice to any residents of adjacent

28  temporary shelters or campsites . . . . The notice shall describe the area subject to clean-up." The



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB      - 21 -

1   Procedures call for storing property for 120 days. As to buildings and structures the Procedures

2   only provide that the City will "take appropriate steps to abate these conditions."

3       71.    Despite putting these procedures in place, the City deprived at least one Bulb

4   resident plaintiff of his personal property without following these procedures.  Specifically, on or

5   about December 9, 2013, a clean-up crew accompanied by Albany police that was acting, upon

6   information and belief, at the direction of Defendants, removed-- and destroyed--  personal

7   property from a shelter the Bulb resident plaintiff was inhabiting, without receiving any informal

8   or written notice as contemplated by the City's procedure.  This clean-up crew and accompanying

9   Albany police were clearly informed by the Bulb resident plaintiff that the structure was inhabited

10   and that the personal property they were removing was his.

11   **Effect of Planned Eviction on Current Bulb Residents**

12       72.    The effect of the eviction on Bulb residents will be devastating. The structures that

13   they call home will be seized and are likely to be destroyed.  Even if their possessions are not

14   thrown away as trash in the course of eviction, they will likely be lost, because the residents will

15   not have any place to keep them.  For many, the Bulb community is the only community they have

16   ever known.  The Bulb is where they have felt supported, accepted, and safe. Given that Albany

17   has offered them neither permanent housing nor allowed them the time and resources necessary to

18   find housing, many will have no choice if they are evicted, but to returning to the streets, and a life

19   lived with the constant threat of criminalization.

20       73.    The effect of criminalization on homeless people is severe.  The penalty for an

21   infraction is a fine.  If they miss a court date, a civil assessment of $300 will be added onto their

22   fine.  A missed court date or an unpaid fine will result in a warrant being issued.  Armed with a

23   warrant, the police can arrest a homeless person at any time.  The constant threat of arrest is

24   particularly detrimental to homeless people who are ill or suffer from physical or mental

25   disabilities.  Additionally, active warrants can impair the ability of a homeless person to get

26   employment, housing, and other benefits.  An outstanding warrant can result in the termination of

27   Social Security benefits.  Homeless individuals must disclose criminal convictions on applications

28   for public housing.  These convictions become a matter of public record.  As a result, the



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB          - 22 -

1  convictions may cause a person who is homeless to lose the opportunity to obtain public and

2  private housing.  Additionally, an individual may lose a housing placement if he or she is

3  incarcerated.  Conviction and incarceration can also interfere with the ability to obtain and

4  maintain Social Security disability benefits.  Recipients may not receive benefits for any period in

5  which they are incarcerated.

6  74.  If current Bulb residents, including Plaintiffs, are forced to leave their homes and

7  live on the street in unfamiliar areas without the support of their community, they will be

8  vulnerable to assault, theft, and harassment.  Women will be particularly at risk of victimization

9  and physical violence.  If people are forced to leave the living spaces they have created for

10  themselves on the Bulb, they are likely to find themselves with no alternative but to live on the

11  street which can result in or exacerbate a variety of physical and mental impairments.  Living on

12  the street, especially during the rainy winter season, causes health problems related to exposure

13  and neglect.  The risk is greatest for the majority of people living on the Bulb who suffer from a

14  variety of mental and physical disabilities.

15  75.  Evicting people currently living on the Bulb, without providing a safe, affordable,

16  appropriate long-term alternative place for them to live poses a serious risk to their health and well-

17  being.  Successfully transitioning Bulb residents to another location, without causing harmful

18  consequences, requires a sustained effort and enough resources and time to find solutions that

19  reasonably accommodate each resident's physical, emotional, and mental health needs.

20  **Eviction Underway**

21  76.  Shortly after midnight on the morning of December 12, 2013 Albany police officers

22  contacted Chester Hill, Glenn Bachelder and Julie Sutton at their dwellings on the Bulb and issued

23  them citations for violation of Albany Municipal Code Section 8-4.3a, which states that a person

24  may not "remain in or enter upon any waterfront and Albany Hill area between 10:00 p.m. and

25  5:30 a.m." All three have significant disabilities that prevent them from being able to access the

26  "transitional shelter." All three have submitted requests for accommodation to the City.

27  77.  On December 9, 2013, plaintiff Kris Sullivan was occupying a dwelling belonging

28  to the two other people for whom housing had been found.  He informed Albany police that the



1   possessions that he had with him at the time were his and he was not abandoning them.

2   Nevertheless, his possessions were taken by the cleanup crew and thrown in a dumpster without

3   Mr. Sullivan ever receiving the notices contemplated by the City's procedures.

**FIRST CLAIM FOR RELIEF**

**Violation of Americans with Disabilities Act and Related State Statutes**
**(42 U.S.C. § 1983; 42 U.S.C. § 12132; Cal. Gov't Code § 11135 *et seq*.)**

6   78.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

7   79.     Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132,

8   provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such
> entity.

12  California incorporates all of these federal protections into state law, such that violations of the

13  ADA are also state law violations and also contains a broad and independent disability civil rights

14  mandate. (Cal. Gov't Code § 11135 *et seq*.)

15  80.     The term "disability" includes persons with mental or physical impairments that

16  limit one or more major life activities.  Cal. Gov't Code § 12926 (i) (medical condition), 12926 (j)

17  (mental disability), 12926 (l) (physical disability).  A number of the plaintiffs and a majority of the

18  residents of the Bulb are qualified individuals with disabilities within the meaning of 42 U.S.C. §

19  12102; 42 U.S.C. § 12131, 28 C.F.R. § 35.104 and Cal. Gov't Code §12926.

20  81.     The ADA and associated state laws obligate public entities to operate each service,

21  program, or activity so that the service, program, or activity, when viewed in its entirety, is readily

22  accessible to and usable by individuals with disabilities.  28 C.F.R. § 35.150.  The Waterfront Park

23  Transition Plan, including, but not limited to the outreach program, the housing subsidy program

24  and the operation of a "transitional shelter" in portable trailers by the City is a "program" or

25  "activity" that must comply with the ADA requirements of accessibility.  In order to comply with

26  the ADA, the City must operate the temporary portable trailers so as to provide disabled persons

27  with "meaningful access" and provide its outreach and support services in a manner and place that is

28  accessible.  With regard to the "transitional shelter", many residents of the Bulb have disabilities that



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                                        - 24 -

will render the portable trailers—and the associated lavatories and showers—inaccessible to them.  In addition to physical disabilities, Bulb residents suffer from mental disabilities like claustrophobia, post-traumatic stress disorder, and schizophrenia.  For people with these disabilities it will be as impossible for them to access the shelter as it would be for a person in a wheelchair required to climb up a flight of steps.  The City's is implementing its Waterfront Park Transition Plan, including its plans to operate the transitional shelter,  under policies, practices, and procedures which systematically fail to reasonably accommodate the needs of individuals with disabilities, so that these programs are not readily accessible to and usable by individuals with disabilities in violation of 28 C.F.R. § 35.150 and Cal Gov't Code § 11135.

82.     The  City's failure to adopt policies or procedures that provide reasonable accommodations for homeless people with disabilities denies Plaintiffs with disabilities meaningful access to the support services contemplated by the Waterfront Park Transition Plan, including the portable trailers, in violation of Title II of the American's with Disabilities Act and 28 C.F.R. § 35.150 and accompanying state law.

83.     In providing the aid, benefits, and services associated with the Waterfront Park Transition Plan, including the portable trailers, the City must provide the Plaintiffs an equal opportunity to participate in and benefit from the aid, benefits, and services of said program. 28 C.F.R. § 130(b )(1)(ii); Cal. Gov't Code § 11135.  Further, the City must provide Plaintiffs with aid, benefits, and services that are at least as effective at affording them the opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as the aid, benefits and services that are available to persons without disabilities. 28 C.F.R. § 130(b)(1)(iii).

84.     Title II of the ADA requires the City to make reasonable modifications in its temporary shelter program to avoid discrimination against Plaintiffs on the basis of disability. 28 C.F.R. § 35.130(b )(7).  It has not done that.

**SECOND CLAIM FOR RELIEF**
**Violation of the Fair Housing Act and California's Fair Employment and Housing Act**
**(42 U.S.C. § 3601 et seq.; Cal. Civ. Code § 54; Cal. Gov't Code § 12955)**

85.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.



86.     Defendants, acting individually and in concert with others, directly and through agents, have engaged in a pattern or discriminatory housing practices against people with disabilities.  Defendants continue to engage in such a pattern or practice of discrimination so as to constitute a continuing violation, including the commission of the following unlawful practices:

       a.  Discriminating in the provision of housing assistance based on disabilities; and

       b.  Engaging in housing assistance practices that have the effect, regardless of intent, of discriminating on the basis of disability, without the existence of any justification for doing so.

87.     As set forth above, upon information and belief, Defendants were on notice of Plaintiffs' need for accommodations for their respective disabilities.  Disabled Plaintiffs were present and active at City Council meetings, providing City officials with an opportunity to hear about those disabilities first-hand.  Furthermore, Plaintiffs' counsel corresponded with Defendants counsel regarding Plaintiffs' need for reasonable accommodations for disabilities on multiple occasions—including prior to the City's decision to enact or fund the Waterfront Park Transition Plan.

88.     Upon information and belief, Defendants provided the portable trailers as transitional housing knowing that they would not accommodate Plaintiffs' respective disabilities. In doing so, Defendants effectively refused to provide reasonable accommodations for disabled Plaintiffs.

89.     Plaintiffs will suffer irreparable injury in the form of deprivation of shelter from the elements if the City is allowed to continue to evict without providing reasonable and accessible transitional housing.  Under these circumstances, Defendants should be enjoined from further evictions until reasonable accommodations are made for disabled Plaintiffs to provide them adequate shelter in light of their respective disabilities.

**THIRD CLAIM FOR RELIEF**
**Violation of Substantive Due Process**
**(Fourteenth Amendment; Art. I, § 7 California Constitution, 42 U.S.C. § 1983)**

90.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

91.     Defendants' plan to continue to evict Plaintiffs from their homes on the Bulb, during



1    these winter months, and to continue to seize or destroy Plaintiffs' dwellings and possessions,

2    without providing adequate suitable accessible shelter, affirmatively threatens their liberty interest

3    protected by the due process clause of the 14th Amendment to bodily security.  It exposes them to

4    the dangerous condition of living on the streets without shelter and does so with deliberate

5    indifference to that danger.

6        92.    Defendants owe Plaintiffs a duty under the due process clause of the Fourteenth

7    Amendments to the U.S. Constitution and Article I, §7 of the California Constitution to not place them

8    in a situation of known danger with deliberate indifference to their safety.

9        93.    The residents of the Bulb face grave risks to their mental and physical health and

10   safety as a result of their eviction from their homes, particularly at the onset of the winter months

11   with dangerously cold temperatures and rain.  Defendants' conduct threatens Plaintiffs' very

12   survival.  Plaintiffs' right to life and liberty is substantially threatened by the City's planned

13   enforcement of Municipal Ordinance § 8-4.

14       94.    Plaintiffs and other Bulb residents suffer from mental disabilities, such as PTSD

15   and claustrophobia, as well as physical disabilities, such as weakened immune systems due to

16   incurable, infectious diseases like Hepatitis C.  The individuals suffering from such disabilities

17   who seek, and are able to access, the temporary communal shelters provided by the City, face

18   further significant dangers resulting from their pre-existing physical and mental conditions

19   including psychological harm and physical illness.  For these individuals in particular, the threat of

20   harm stemming from the City's planned enforcement program is severe: either face the risk of

21   aggravating their already vulnerable mental and physical health by utilizing the temporary shelter

22   offered by the City or live on the streets without any shelter, exposed to the elements during the

23   cold winter months.  The City has been informed of these dangers and has, with deliberate

24   indifference, chosen to proceed with its enforcement plan.

**FOURTH CLAIM FOR RELIEF**
**Violation of Right to Be Secure from Unreasonable Seizures**
**(Fourth Amendment; 42 U.S.C. § 1983)**

27       95.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

28       96.    In or around early October, the City issued guidelines providing that property and



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                              - 27 -

structures stored on the Bulb will be subject to seizure and/or destruction.  The City's Administrative Procedures provide that personal property seized during their sweep of the Bulb will be stored for one hundred twenty (120) days.  Property not claimed after 120 days presumably will be destroyed.  The City plans to "abate" buildings and structures, which, given the absence of any procedure for "abatement," and past experience, will result in the destruction of Bulb residents' dwellings.

97.   The Plaintiffs have property rights in their possessions and dwellings on the Bulb. These dwellings are not abandoned, they are not an immediate threat to public health and safety, nor are they contraband or evidence of a crime.  The City's plan to destroy dwellings and dispossess Plaintiffs and other Bulb residents of their homes after many years of allowing and encouraging Plaintiffs to establish dwellings on the Bulb will result in the unreasonable seizure and destruction of Plaintiffs' property in violation of their Fourth Amendment rights.

98.   Plaintiffs seek redress for Defendants' violation of their right to be secure from unreasonable seizure.

**FIFTH CLAIM FOR RELIEF**
**Violation of Right to Procedural Due Process of Law**
**(Fourteenth Amendment; 42 U.S.C. § 1983; Art. I, §7 Calif. Constitution)**

99.   Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

100.   Due process requires a minimum notice and an opportunity to be heard if the government intends to deprive a person of his or her property.  Defendants have issued "Administrative Procedures for the Removal of Temporary Shelters, Personal Property and Refuse," which promise a notice period for seizure and destruction of property.  But they provide for neither a pre-deprivation nor a post-deprivation hearing for people whose personal property the Defendants intend to take, and whose buildings and structures it intends to "abate."

101.   In their guidelines, Defendants promise that they will err on the side of caution in separating valuable property from waste to be discarded.  But despite this promise, Defendants have already summarily deprived at least one Plaintiff of his personal property, even though he was standing next to it and claimed it as his.

102.   The guidelines do not specify the process that will be followed in abating the



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                                    - 28 -

1  buildings and structures, which have been people's homes.  Defendants have represented to the

2  Court that they will follow their standard procedure for abatement of dangerous structures. But

3  they have already reneged on the undertakings it made in its guidelines.  Defendants have entered

4  the Bulb, with heavy equipment, and threatened to destroy structures.  Plaintiffs justifiably fear

5  that their homes will be demolished without a hearing.

6      103.    Plaintiffs seek redress for Defendants' violation of their right to due process of law

7  and an injunction against future violations to Plaintiffs' rights to due process under the law.

8                      **SIXTH CLAIM FOR RELIEF**
                  **Violation of Due Process—Vagueness**
9              **(Fourteenth Amendment; 42 U.S.C. §1983)**

10     104.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

11     105.    Albany Municipal Code § 8-4.4 as written, forbids loitering, lodging, and camping.

12  It provides no definition of these terms. It provides no guidance to what constitutes "lodging," and

13  "camping."  These are offenses so lacking in definition that Plaintiffs, who are homeless, cannot

14  reasonably know what conduct is forbidden.  They are an invitation to selective enforcement.[4]

15  Municipal Code § 8-4 is unconstitutionally vague on its face and as applied to people who are

16  homeless.in violation of the Fourteenth Amendment to the United States Constitution.  Plaintiffs

17  seek redress for Defendants' violation of their due process rights under the Fourteenth

18  Amendment.

19                     **SEVENTH CLAIM FOR RELIEF**
                  **Violation of Right to Privacy**
20        **(Art. I, § 1 Calif. Constitution; U.S. Bill of Rights)**

21     106.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

22     107.    Plaintiffs, like all other Californians, enjoy the protections of both Article I, § 1 of

23  the California Constitution and the penumbra of rights created by the First, Third, Fourth, Fifth,

24  Ninth Amendments of the U.S. Constitution, including the right to privacy.  Privacy is a

25  fundamental right.

26

27      [4] In recognition of the constitutional infirmity of § 8.4.4, the Albany City Council voted at its
     October 2, 2013 meeting to delete the reference to loitering from this code provision.  The bans on
28   "camping" and "lodging" however remain.



108.    The right to privacy protects the right to make intimate personal decisions and conduct personal activity without observation, intrusion, or interference.  For example, choosing who one lives with and excluding others from one's home are exercises of the right to privacy.

109.    With the knowledge of the City, and sometimes at the City's direction, Plaintiffs created homes and private dwellings on the Bulb.  They have lived in these homes for many years and have exercised their rights to privacy in these habitations.

110.    Defendants' planned eviction of Plaintiffs from their homes and the threatened destruction of these structures will leave Plaintiffs without any shelter or other place they may exercise their rights to privacy.  All other venues within Albany in which Plaintiffs may attempt to exercise their privacy rights — rights they have enjoyed in their homes on the Bulb — will be criminally off-limits to them.

111.    Plaintiffs will face criminal sanction if they seek to remain in their homes.  They will be similarly criminally sanctioned if they establish new shelters in any other areas in Albany.  A limited amount of "shelter space" will be available: night-only access to bunk beds in communal portable trailers for six months.  There are insufficient beds for all Bulb residents and many residents, including Plaintiffs, have disabilities that preclude them from accessing the shelter and medical conditions that would make it dangerous for them to do so.

112.    Bulb residents who are not precluded by medical condition or disability from utilizing the shelter will not be able to do so without giving up the right to privacy they currently enjoy.  They will have to give up the right to make intimate personal decisions and conduct personal activity without observation, intrusion or interference.  They will be subjected to video and audio surveillance which invades their reasonable expectation of privacy.  If they refuse to give up their right to privacy and wish to sleep the night in Albany, they will have no choice but to violate Albany Municipal Code 8-4.4 or risk arrest for sleeping on the sidewalk.

113.    Public entities in California cannot condition the receipt of a public benefit on the waiver of Constitutional rights except under certain extreme circumstances.  This, however, is exactly what Albany is doing when the "benefit" of obtaining shelter, meals and participating in the City's housing subsidy program is conditioned on Plaintiffs giving up the right to privacy they



1    currently enjoy.  Defendants cannot satisfy the heavy burden of demonstrating the practical

2    necessity for this condition.  The public accrues no benefit from this impairment of Plaintiffs'

3    right to privacy, and, although they are not required to do so, Plaintiffs have identified to Albany

4    available alternative means that could maintain the integrity of Albany's temporary shelter

5    program without severely restricting a constitutional right.  Defendants, however, have insisted on

6    their current scheme.

7        114.    Defendants' plan to seize or destroy Plaintiffs limited shelter against the elements

8    during the winter months, expel them from their home on the Bulb, cite or arrest them if they fall

9    asleep in public and condition the provision of shelter on the waiver of Plaintiffs' right to privacy

10   under the U.S. and California Constitution is a violation of their Plaintiffs' Constitutional rights to

11   privacy.

12       115.    Plaintiffs seek redress for the City's violation of their Constitutional right to

13   privacy.

14                                   **PRAYER FOR RELIEF**

15        WHEREFORE, based on the allegations asserted herein, Plaintiffs respectfully request

16   relief as follows:

17       1.    A temporary restraining order and/or preliminary and permanent injunction,

18   enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing

19   Albany Municipal Code §8-4, against persons who are homeless and currently living on the Bulb

20   so long as there is not a location available in Albany where they can find shelter that protects those

21   persons' right to privacy and reasonably accommodates their disabilities.

22       2.    A temporary restraining order and/or preliminary and permanent injunction,

23   enjoining Defendants, their officers, employees, assignees, successors, and agents from enforcing

24   Albany Municipal Code §8-4, against persons who are homeless and currently living on the Bulb

25   without providing them with an adequate hearing before depriving them of their property interest

26   in their personal property and/or dwelling.

27       3.    A declaration that Defendants' past, present, and threatened future enforcement of

28   § 8-4 violates Plaintiffs' rights to be secure from unreasonable seizure under the United States



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                            - 31 -

1   Constitution;

2       4.      A declaration that Defendants' past, present, and threatened future enforcement of

3   § 8-4 violates Plaintiffs' rights to due process of law under the United States and California

4   Constitutions;

5       5.      A declaration that the City's plan to operate a temporary transitional shelter that is

6   not readily accessible to individuals with disabilities violates the ADA and California State law;

7       6.      A declaration that Albany Municipal Code Section § 8-4.4 is void for vagueness

8   under the United States Constitution;

9       7.      A declaration that Defendants' past, present and threatened future enforcement of §

10  8.4 under the circumstances here violates Plaintiffs' right, the right to privacy guaranteed under

11  the California and U.S. Constitutions;

12      8.      A declaration that Defendants' conduct violates the Fair Housing Act and

13  California's Fair Employment and Housing Act;

14      9.      Plaintiffs' costs incurred in this lawsuit pursuant to 28 U.S.C. § 1920 and 42 U.S.C.

15  § 1988, as well as any appropriate provisions of California law;

16      10.     Plaintiffs' reasonable attorney's fees, pursuant to 42 U.S.C. § 1988, and analogous

17  provisions of California law; and

18      11.     All such other relief as this Court deems just and proper.

19                          **DEMAND FOR JURY TRIAL**

20      Plaintiffs hereby demand a jury trial as to all issues triable to a jury.

21

22  DATED:  December 16, 2013          Respectfully submitted,

23                                     KILPATRICK TOWNSEND & STOCKTON LLP

24

25                                     By: */s/ Maureen A. Sheehy*
                                           MAUREEN A. SHEEHY
26

27

28



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                    - 32 -

1   DATED:  December 16, 2013          EAST BAY COMMUNITY LAW CENTER

2
                                      By: */s/ Osha Neumann*
3                                         OSHA NEUMANN

4
    DATED:  December 16, 2013          HOMELESS ACTION CENTER
5

6
                                      By: */s/ Patricia E. Wall*
7                                         PATRICIA E. WALL

8

9

10
    65944259V.1
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO. CASE NO. 3:13-CV-5270-CRB                                    - 33 -